**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**CHARLOTTESVILLE DIVISION**

CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILE, VA
FILED

02/14/2020

JULIA C. DUDLEY, CLERK
BY: H. Wheeler
DEPUTY CLERK

| | |
|---|---|
| VIVIANA ANSELME and ALYSHA HONEYCUTT,<br><br>    Plaintiff,<br><br>v.<br><br>FLUVANNA CORRECTIONAL CENTER FOR WOMEN, ERIC ALDRIDGE, ERIC GRIFFIN, SGT. PEREZ, and RAHEEM RAMSEY,<br><br>    Defendants. | Case No.  3:20CV00005 |

## COMPLAINT

Plaintiffs Viviana Anselme ("Anselme") and Alysha Honeycutt ("Honeycutt") (collectively "Plaintiffs'), by counsel, for their Complaint against Defendants Fluvanna Correctional Center for Women ("FCCW"), Eric Aldridge ("Aldridge"), Eric Griffin ("Griffin"), Sgt. Perez ("Perez"), and Raheem Ramsey ("Ramsey") (collectively "Defendants"), allege the following:

### PARTIES

1.      FCCW is a state prison run by the Virginia Department of Corrections.  FCCW is located at 144 Prison Lane, Troy, Virginia 22974.  Plaintiffs seek only equitable relief from FCCW.

2.      Aldridge is and was, at all relevant times, the warden of FCCW.  Plaintiffs seek equitable relief from Aldridge in his official capacity, and damages against Aldridge in his individual capacity.

3.     Griffin was, at all relevant times, a correctional officer employed by FCCW. Anselme seeks damages against Griffin in his individual capacity.

4.     Perez was, at all relevant times, a correctional officer employed by FCCW. Anselme seeks damages against Perez in his individual capacity.  Anselme is unaware of Perez's first name, and will amend her complaint once she obtains the name through discovery or a filing by Perez.

5.     Ramsey was, at all relevant times, a correctional officer employed by FCCW. Honeycutt seeks damages against Ramsey in his individual capacity.

6.     Anselme is, and at all relevant times was, an inmate at FCCW.

7.     Honeycutt is, and at all relevant times was, an inmate at FCCW.

## JURISDICTION AND VENUE

8.     The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, because this case arises under the Constitution and laws of the United States.

9.     Personal jurisdiction is proper in this judicial district because Defendants, and each of them, reside, work, or otherwise maintain continuous and systematic contact within this judicial district.

10.     Venue within this judicial district is proper under 28 U.S.C. §§ 1391(b) because each Defendant is subject to personal jurisdiction in this judicial district and because a substantial part of the conduct giving rise to this action occurred within this judicial district.

## PROCEDURAL HISTORY

11.     Anselme previously filed a related action in Fluvanna County Circuit Court on April 4, 2019.  Anselme voluntarily nonsuited that action on August 16, 2020, thereby extending

the statute of limitations on the claims asserted by six months, pursuant to Virginia Code § 8.01-299(E)(3).

## FACTS

### Griffin's Sexual Assault on Anselme

12.     Anselme began having interactions with Griffin almost as soon as she came to FCCW in 2017.  Initially, Griffin's behavior toward Anselme was professional, and even friendly.

13.     Inmate A[1], an inmate whose cell was near Anselme's cell, warned Anselme that Griffin would often lurk around Anselme's cell, looking in.  Inmate A told Anselme that Griffin paced back and forth to look at Anselme, and even tripped and nearly fell on one occasion because he was watching Anselme rather than paying attention to where he was walking.

14.     On April 8, 2017, Anselme disrobed and bathed at the sink in her cell.  When she was finished, Anselme went to her bed, wrapped herself in a towel, and applied lotion to her skin.  After finishing and putting the lotion back in its place, Anselme turned around and saw Griffin standing at her door, staring at her.

15.     Griffin ordered Anselme to come to the door, and she complied.  Griffin then whispered to Anselme, "That's an indecent exposure charge."  Anselme now feared that Griffin would write her up on a disciplinary charge for bathing at her sink.  Anselme's fear was particularly acute because she had pending probation violation charge, and Anselme feared that a disciplinary charge from FCCW could lead to additional punishment or another worse outcome with respect to the probation violation.  Griffin then walked away.

---

[1] Inmates other than Anselme and Honeycutt are identified herein by pseudonyms to protect their privacy for as long as possible, due to the potential for retaliation against them.

16.     Under normal circumstances, Griffin's rounds took him past Anselme's cell approximately once every 30 minutes.  In this instance, Griffin returned to Anselme's cell within just a few minutes.  He once again ordered Anselme to approach the cell door, and Anselme again complied.

17.     Anselme pleaded with Griffin not to write her up for indecent exposure.  Griffin whispered, "I love your ass. I won't write you up. Just let me see it again."  Anselme refused. Griffin then said, "Just let me feel it."

18.     Griffin then sexually assaulted Anselme by thrusting his fingers into Anselme's vagina, then rapidly and repeatedly plunging them in and out.  Griffin's attack was so violent that Anselme began bleeding from her genital area.  Griffin then abruptly ceased his attack and walked away.

19.     During the attack, Anselme was paralyzed. She wanted to fight back, but felt that she was at Griffin's mercy, because Griffin was in a position of authority and power over her.

20.     For a while thereafter, Griffin did not acknowledge his attack on Anselme, behaving as if nothing had happened.  Anselme was mentally torn between the desire to report Griffin's attack and the fear of negative consequences in her upcoming probation violation hearing.

21.     On April 14, 2017, Griffin returned to Anselme's cell door and announced to her, "I'm going to call you Juicy."  Anselme covered herself with her blanket and turned away from Griffin to face the wall.

22.     Griffin returned to Anselme's cell several times that day, asking in a low voice, "Are you O.K.?"  Griffin knew that Anselme was not O.K., because of the sexual assault he had inflicted on her.  Each time Griffin returned, Anselme turned away from him to face the wall.

23.     On April 21, 2017, Griffin returned to lingering near Anselme's cell and staring at her on several occasions.  Without speaking aloud, Griffin mouthed that he wanted to speak with Anselme the next day.

24.     On April 23, 2017, Griffin attempted to draw Anselme into conversation, but she remained silent.  While handing Anselme her food tray, Griffin grabbed Anselme's fingers. Terrified, Anselme took her tray and walked away as fast as possible.

25.     Several times the same day, Griffin returned to Anselme's cell and asked if she was O.K.  Anselme hid under the covers and refused to talk to Griffin.

26.     Finally, Anselme answered, "Yes," hoping that Griffin would leave her alone once she had responded to his questioning.  Instead, Griffin kept talking to Anselme, saying, "I worried about you for three days.  I was walking the whole house worried about you.  Are you feeling O.K.?"  Anselme again replied, "Yes."  Griffin then asked if Anselme's children were O.K. Anselme again replied, "Yes."  Anselme was terrified during the entire exchange because of Griffin's earlier attack, and shocked at Griffin's attempts to engage in friendly conversation as if the attack had never happened.  Griffin finally ended the exchange, saying, "I'm going to let you go to sleep."

27.     On April 23, Inmate B, an inmate in the cell next to Anselme's told Anselme, "That man [Griffin] keeps staring in your cell every single time he goes up the steps.  He came down here five times in fifteen minutes.  He has got it bad for you."

28.     Indeed, Inmate B had witnessed Griffin's unusual behavior toward Anselme on numerous occasions.  She frequently observed Griffin returning to Anselme's cell to stare at her outside of his regular rounds.

29.     Inmate B also repeatedly observed Griffin approach Anselme's door, asking her if she was O.K. and if she "needed anything."  When Anselme replied in the negative, Griffin asked if she was sure she didn't "need anything," and then licked his lips at Anselme.

30.     On another occasion, Anselme asked Griffin for an extra food tray.  Inmate B witnessed Griffin respond by asking Anselme what she was willing to do for an extra tray, all the while leering at her in a suggestive manner.

31.     On another occasion, Inmate B witnessed Anselme ask Griffin for a gown and a pair of pants.  Griffin replied that such clothing was "not a privilege in seg" (the segregation area where Anselme was being held), and told Anselme that she would have to "earn" his "services."

32.     On the same day, Inmate B heard Anselme tell Griffin that she was going to report his sexual assault and other abusive behavior.  Griffin laughed and said, "Go ahead. They will never believe you," and then began laughing at Anselme.

33.     Later the same day, Inmate B saw Griffin whispering to Anselme.  Although she could not hear Griffin's words, she could hear Anselme reply that she would not "show [Griffin] her pussy" or "touch herself" for Griffin.

34.     On May 10, 2017, with her probation hearing having passed, Anselme reported Griffin's assault to FCCW officials, including Aldridge.  On May 24, 2017, Anselme filed a formal grievance, and requested that she be removed from FCCW due to the trauma of the assault.

35.     FCCW completed its investigation into Anselme's allegations on June 18, 2017, and the case was referred to the Fluvanna County Commonwealth's Attorney's office.

36.     However, FCCW and Aldridge did not transfer Anselme.

37.     On June 14, 2018, Griffin was convicted of felony carnal knowledge of an inmate in Fluvanna County Circuit Court.

**Perez's Sexual Misconduct Toward Anselme**

38.     Griffin is not the only FCCW correctional officer to sexually victimize Anselme.

39.     In October 2018, Perez ordered Anselme to show him her genitals.  When Anselme refused, Perez grabbed his crotch and told Anselme that he had "a big dick."  He then said, "Do you want to see?  I'll show you."  He also told Anselme that she "made his dick hard."

40.     Perez was well known around FCCW for asking inmates to expose their genitals, and offering special favors to those who complied.

41.     Perez was also an officer responsible for *receiving and evaluating sexual assault complaints at FCCW*.  Following the first incident with Anselme, Anselme attempted to report to Perez the sexually threatening behavior of one inmate to another.  Perez responded by again telling Anselme that she "made his dick hard," which "hardly ever happens, because he normally has control."

42.     Perez dismissed Anselme's report of inmate-on-inmate sexual misconduct, stating that since the aggressor did not touch the victim, it "wasn't a PREA[2] issue."  Perez then instructed Anselme to "stop making so much noise" by reporting sexual misconduct.

**Ramsey's Sexual Assault on Honeycutt**

43.     In the early morning hours of November 20, 2019, Ramsey summoned Honeycutt out of her cell.  Ramsey took Honeycutt through a door and into an employee-only area where, upon information and belief, there was no video surveillance coverage.

44.     Once inside the restricted area, Ramsey took Honeycutt down a set of stairs and onto a landing.

---

[2] "PREA" refers to the Prison Rape Elimination Act, a law intended to combat sexual assault in correctional facilities.

7

45.     Ramsey put his hand under Honeycutt's shirt and pulled her close to him.  He then began pushing Honeycutt's head downward, toward his penis.  Honeycutt resisted, but Ramsey kept pushing until Honeycutt was on her knees.  Ramsey then forced his penis into Honeycutt's mouth and made her perform oral sex on him.

46.     After about a minute, Ramsey told Honeycutt to turn around and bend over. Ramsey then pulled Honeycutt's pants down and forced his penis into her vagina from behind, using his hand to cover Honeycutt's mouth while he did so.

47.     At this point, another corrections officer hailed Ramsey over the intercom.  Ramsey left Honeycutt on the landing to go and speak with the other officer, then returned a short time later.

48.     When Ramsey returned, he again made Honeycutt suck his penis, this time forcing her mouth all the way down to the base, which made her gag.

49.     Ramsey then vaginally raped Honeycutt again.  Ramsey started his renewed assault with Honeycutt in a standing position, and then forced her to lay on the filthy floor.  Ramsey completed his attack by ejaculating inside Honeycutt.

50.     Ramsey then instructed Honeycutt to wait until he had left the employee-only area before leaving and returning to her cell.  Honeycutt complied with Ramsey's instructions.

51.     Honeycutt filed an informal complaint against Ramsey on November 28, 2019, followed by a grievance on December 16, 2019.

52.     On January 16, 2020, Honeycutt received a response to her grievance, which stated that Honeycutt's allegations fell under PREA, and that "the grievance department has no authority to investigate your PREA allegation."  The response stated that Honeycutt's complaint had been referred outside of the grievance process to "SIU," a term not defined in the response.

### History of Sexual Violence and Retaliation at FCCW

53.    Both Anselme and Honeycutt have experienced retaliation since they reported sexual misconduct by correctional officers, including being placed in segregation, having personal property confiscated by correctional officers, and being subjected to invasive strip searches.

54.    Upon information and belief, Anselme's cell was monitored by video camera at all times relevant to Griffin's sexual assault on Anselme.

55.    Aldridge was therefore on notice of the attack, and did nothing about it until Anselme reported the attack herself, presumably hoping that the situation would blow over.

56.    Aldridge's deliberate indifference facilitated Griffin's attack on Anselme, along with Griffin's subsequent psychological torture of Anselme, during which he alternated between making additional sexual comments to Anselme, repeatedly staring at Anselme, and talking to Anselme solicitously, as if he had not attacked her.

57.    Moreover, Griffin had a long history of sexual misconduct at FCCW that FCCW and Aldridge did nothing to stop.  In October of 2010, Griffin assaulted Inmate C, in an incident with several details similar to his actions toward Anselme.

58.    As Inmate C was returning to her housing unit through the sally port, Griffin blocked her path with his body, so that she could not pass.  Griffin ordered Inmate C to show him her genitals and masturbate for him the next time he passed by on his rounds.

59.    When Inmate C refused, Griffin wrote her up on a false charge of assault.  During the investigation, Inmate C reported Griffin's assault, but FCCW officials dismissed Inmate C's

allegations. Inmate C was convicted of the assault charge, placed in segregation for two months, lost her job, and could not get another job for nearly a year.

60.     Inmate C saw Griffin again about a year after Griffin's assault on her. Inmate C asked Griffin for an apology. Griffin refused, stating that Inmate C should "get over it" because it was "in the past."

61.     Similarly, Ramsey was well known among inmates at FCCW for seeking sexual contact with inmates, often by trading contraband or other favors.

62.     Perez's sexual misconduct is particularly disturbing. Perez's comments to Anselme indicate that Perez did not take sexual assault at FCCW seriously, despite the fact that he was an officer responsible for fielding complaints of sexual assault. Perez's comments also indicate either (1) a willful and perverse misinterpretation of the PREA by FCCW and Aldridge, namely that sexual misconduct cannot occur in the absence of physical contact between the perpetrator and victim; or (2) a failure by FCCW and Aldridge to properly instruct correctional officers at FCCW about the requirements of the PREA. Finally, the fact that Perez engaged in sexual misconduct toward Anselme *while Anselme was attempting to report sexual misconduct* demonstrates that FCCW and Aldridge's approach to sexual misconduct is a complete farce; their complicity in sexual assault is so endemic that even the correctional officers responsible for preventing and stopping such behavior dismiss inmate complaints and engage in sexually predatory behavior themselves.

63.     Moreover, Griffin, Perez, and Ramsey are not the only correctional officers at FCCW to engage in sexually predatory behavior toward inmates. On November 30, 2018, Inmate D went to the vestibule area of cell-block 2-D to get some papers from a filing cabinet. As she was reaching for the papers, FCCW correctional officer Fall ("Fall") put his hand between Inmate

D's legs on her vagina, and began rubbing his fingers back and forth.  When Inmate D looked at

Fall in shock, he simply looked at her and said, "Yes?" as if his behavior was perfectly normal.

64.     Moreover, FCCW has a long and well-documented history of sexual predation by

correctional officers, as well as dysfunctional responses to such predation.

65.     For example, a report by the Virginia Department of Corrections ("DOC")

reviewed 44 inmate complaints of sexual assault and harassment by FCCW employees. The report

found that 13 of the reviewed cases resulted in the perpetrator being fired or resigning.[3]

66.     Additionally, in testimony to a review panel on prison rape conducted by the United

States Department of Justice's Office of Justice Programs, former FCCW inmate Melissa Andrews

gave a harrowing account of sexual assault and institutional indifference at FCCW.

67.     Andrews testified that sexual contact between inmates and correctional officers was

endemic at FCCW, with inmates trading "consensual[4]" sex for perks and special treatment.[5]

68.     Andrews also testified that when inmates reported sexual assault—whether by

fellow inmates or correctional officers—they were placed in segregation and not offered medical

treatment or counseling.  If there were no physical marks on the complaining inmate, the report

was summarily discounted.  Most complaints of sexual assault by correctional officers simply

---

[3] https://www.washingtonpost.com/archive/local/1999/12/23/va-investigation-finds-no-pattern-of-abuse-at-womens-prison/52759dbc-61cb-412f-a6e7-2e453fcf32cc/ (last visited February 14, 2020).
[4] Of course, no sexual contact between a correctional officer and an inmate can truly be consensual, due to the inherent power imbalance between the two parties.  This is why such sexual contact is a crime in Virginia, even in the absence of force or intimidation; "consent" is not a defense to the charge.  *See* Va. Code § 18.2-64.2; *Heywood v. Va. Peninsula Reg'l Jail Auth.*, 217 F. Supp. 3d 896, 899 n.4 (E.D. Va. 2016).
[5] https://ojp.gov/reviewpanel/pdfs_apr11/testimony_andrews.pdf (last visited February 14, 2020).

resulted in the officer being "moved to another building," where they were free to prey on other inmates.[6]

69.    Helen Trainor, the former director of the Virginia Institutionalized Persons Project of the Legal Aid Justice Center, testified before the same panel as Andrews.  Trainor worked with inmates at FCCW for three and a half years, during which time she met with approximately 100 inmates and corresponded with approximately 150 others.  Trainor offered the following scathing critique of the handling of sexual assault at FCCW:

> Of all of the complaints about sexual misconduct I have heard from inmates at FCCW, the complaints relating to officer on inmate misconduct outnumber those relating to inmate on inmate misconduct by a factor of about ten to one.  It is therefore striking that the list of policies and practices that follows are aimed at deterring inmate on inmate sexual misconduct rather than the true source of the problem.  I believe these policies and practices serve a dual purpose.  First, they create the illusion that inmate on inmate sexual misconduct is an issue, thus deflecting the unwanted attention FCCW received as a result of a recent sex scandal involving a major.   Second, by creating a culture of degradation, shame, and intimidation, they ensure that sexual victimization of inmates by officers will continue unabated and unchallenged. [7]

70.    According to a report by WVTF public radio, a FCCW inmate named Michelle Cooper was repeatedly sexually harassed and sodomized by an FCCW employee.  In response to a lawsuit, the Virginia Department of Corrections admitted that Cooper's account was true, but denied responsibility for the attacks.[8]

71.    According to a survey on sexual victimization in prisons and jails by the United States Justice Department's Bureau of Justice Statistics, six percent of FCCW inmates reported being sexually victimized by a staff member.  This was three times the national average of two

---

[6] *Id.*

[7] https://ojp.gov/reviewpanel/pdfs_apr11/testimony_trainor.pdf (last visited February 14, 2020).

[8] https://www.wvtf.org/post/woman-raped-prison-sues-state-damages#stream/0 (last visited February 14, 2020).

12

percent.  FCCW was one of only two womens' prisons—out of 463 surveyed—found to have a "high rate of sexual misconduct."[9]

72.     In sum, sexual assault on inmates has been rampant at FCCW both before and during Aldridge's tenure as warden.  The prevalence of assault required FCCW and Aldridge to take corrective measures to ensure that inmates like Anselme and Honeycutt would be free of sexual assault.  FCCW and Aldridge either took no corrective measures, or took measures that were patently ineffective.

73.     Moreover, because Anseleme and Honeycutt were not Griffin and Ramsey's first victims, FCCW and Aldridge was on notice of their's proclivity for sexually assaulting inmates, and failed to terminate their employment before they could assault Anselme and Honeycutt.

**COUNT I**
**42 U.S.C. § 1983**
**Claim for Damages by Anselme Against Griffin, Perez, and Aldridge in His Individual Capacity**

74.     The previous paragraphs are hereby incorporated by reference.

75.     Griffin violated Anselme's rights under the Fourth, Eighth, and Fourteenth Amendments by sexually assaulting, and subsequently psychologically torturing Anselme.

76.     Perez violated Anselme's rights under the Eighth and Fourteenth Amendments by engaging in sexual misconduct toward Anselme.

77.     Aldridge violated Anselme's rights under the Eighth and Fourteenth Amendments by being deliberately indifferent to the risk that Griffin and Perez would assault Anselme, because of known specific histories of misconduct by those officers and/or because sexual misconduct is pervasive and endemic at FCCW.

---

[9] https://www.dailyprogress.com/news/fluvanna-women-s-prison-cited-for-high-rate-of-sexual/article_58b30046-d6b3-5fa7-9593-9025139c5e26.html (last visited February 14, 2020).

13

78.     As a direct result of Defendants' violations of her rights, Anselme has suffered substantial physical injury, pain, suffering, and mental anguish.

## COUNT II
## 42 U.S.C. § 1983
## Claim for Damages by Honeycutt Against Ramsey, and Aldridge in His Individual Capacity

79.     The previous paragraphs are hereby incorporated by reference.

80.     Ramsey violated Honeycutt's rights under the Fourth, Eighth, and Fourteenth Amendments by repeatedly raping and sodomizing Honeycutt.

81.     Aldridge violated Honeycutt's rights under the Eighth and Fourteenth Amendments by being deliberately indifferent to the risk that Ramsey would assault Honeycutt, because of a known specific history of misconduct by Ramsey and/or because sexual misconduct is pervasive and endemic at FCCW.

82.     As a direct result of Defendants' violations of her rights, Honeycutt has suffered substantial physical injury, pain, suffering, and mental anguish.

## COUNT III
## 42 U.S.C. § 1983
## Claim for Equitable Relief by Anselme and Honeycutt against FCCW, and Aldridge in His Official Capacity

83.     The previous paragraphs are hereby incorporated by reference.

84.     FCCW and Aldridge violated, and continue to violate, Anselme and Honeycutt's rights under the Eighth and Fourteenth Amendments by maintaining a policy of inaction or grossly ineffective action in the face of widespread sexual misconduct at FCCW.

85.     As a direct result of Defendants' violations of their rights, Anselme and Honeycutt have suffered and/or presently suffer substantial physical injury, pain, suffering, and mental anguish.

WHEREFORE, Anselme and Honeycutt respectfully request that the Court:

A.       Award Anselme compensatory damages in the amount of $5 million against Griffin, Perez, and Aldridge in his individual capacity;

B.       Award Anselme punitive damages in the amount of $5 million against Griffin, Perez, and Aldridge in his individual capacity;

C.       Award Honeycutt compensatory damages in the amount of $5 million against Ramsey, and Aldridge in his individual capacity;

D.       Award Honeycutt punitive damages in the amount of $5 million against Ramsey, and Aldridge in his individual capacity

E.       Award Anselme and Honeycutt appropriate equitable relief against FCCW and Aldridge in his official capacity, including, without limitation, preliminary and permanent injunctive relief restraining the unlawful practices alleged herein and/or compelling whatever action is necessary and appropriate to preserve inmate safety at FCCW.

F.       Award Anselme and Honeycutt reasonable attorney's fees, pursuant to 42 U.S.C. § 1988;

G.       Award Anselme and Honeycutt the costs of this action; and

H.       Award Anselme and Honeycutt such other and further relief as justice requires.

## JURY DEMAND

Anselme and Honeycutt demand a trial by jury as to all issues so triable.

DATED:  February 14, 2020                Respectfully submitted,

/s/ *Robert O. Wilson*
Robert O. Wilson (VSB 77791)
**WILSON LAW PLC**
2 South Main Street, Suite 409
Harrisonburg, Virginia 22802
Phone:  (540) 430-0122
Email:  robert@thewilsonlaw.com

*Counsel for Plaintiffs*